**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **THOMAS BITTEL** | * | **CIVIL ACTION** |
| | * | |
| **versus** | * | **No. 13-149** |
| | * | |
| **CHEVRON U.S.A. INC, ET AL.** | * | **SECTION "L" (3)** |

**ORDER & REASONS**

Before the Court is a motion for summary judgment filed by Defendant Chevron U.S.A. Inc. ("Chevron"). (Rec. Doc. 52). The Court has reviewed the briefs and the applicable law and, having heard oral argument on the motion, now issues this Order & Reasons.

## I. BACKGROUND

This case arises out of an injury that Plaintiff Thomas Bittel experienced while he was employed by Dynamic Industries ("Dynamic") to perform offshore construction duties aboard a fixed platform in the Gulf of Mexico. The platform is owned by Defendant Chevron U.S.A. Inc ("Chevron"). According to his complaint, filed on January 25, 2013, Bittel participated in moving a section of pipe on the platform on January 27, 2012. The project involved running a cable from the tugger on the production deck to a clamp on a beam and down to a section of the pipe below the production deck. Bittel alleges that he was located under the production deck as a rigger when the clamp failed and the pipe fell and struck Bittel, causing serious injuries. Bittel claims that he fell through the grating floor. He experienced a fractured skull as well as other fractures and had to be hospitalized. Bittel claims that he has sustained permanent disfigurement from the accident.

At the time of the accident, Bittel was located inside a set of barricades that was arranged around the cellar deck opening and beneath the suspended flow-line. Bittel claims that Defendant Danny Gauthreaux, an employee of Defendant Audubon Field Solutions ("Audubon"), directed him to enter the barricaded area. (Rec. Doc. 55-2 at 112). According to Bittel, Gauthreaux realized that the pipe had a flange on the back that might get caught on the grating as it was being drawn up. Bittel claims that Gauthreaux directed him to enter the barricaded area to guide the pipe. Bittel further claims that Gauthreaux had been assigned to be Chevron's "representative" or "company man" on the platform. (Rec. Doc. 55-1 at 2). Gauthreaux denies having told Bittel to enter the barricaded area. (Rec. Doc. 55-3 at 69). According to Gauthreaux, he saw Bittel enter the barricade earlier and told him that he needed to get out of the hole and "tie off" before he crossed into the barricaded area. (Rec. Doc. 55-3 at 69).

Bittel filed the present lawsuit against Chevron, Danny Gauthreaux, and Audubon. Bittel claims that Defendants were negligent because, among other things, they did not load test the equipment, ensure that proper equipment was used, and perform a thorough Job Safety Analysis. Bittel is asking to be compensated for his pain and suffering, medical expenses, diminished earning capacity, permanent disfigurement, and future medical expenses.

Defendants each filed an answer in which they deny liability and asserted various affirmative defenses. Defendants claim that the accident occurred because of the fault or negligence of Bittel and other parties for whom Defendants do not think they are responsible.

On June 3, 2013, American Zurich Insurance Company filed a complaint in intervention. (Rec. Doc. 12 at 1). American Zurich explains that it has paid, and is currently paying,

indemnity and medical benefits to Bittel pursuant to the LHWCA. American Zurich claims that it is entitled to preference and priority over Bittel for any judgment rendered in his favor.

## II. PRESENT MOTION

### A. Chevron's Motion for Summary Judgment

On June 17, 2014, Defendant Chevron filed a motion for summary judgment. First, Chevron explains that the accident occurred on an installation on the Outer Continental Shelf, therefore the Outer Continental Shelf Lands Act (OCSLA) applies. According to Chevron, OCSLA adopts the law of the state adjacent to the installation as long as that law is not inconsistent with other federal laws and regulations. Chevron claims that the Petronius platform, where the accident took place, is adjacent to the state of Alabama. (Rec. Doc. 52-1 at 11). Therefore, Chevron claims that Alabama law applies to this case.

Applying Alabama law, Chevron argues that it cannot be held liable for the Plaintiff's injuries because "a premises owner generally owes no duty of care to employees of an independent contractor with respect to work performed under a contract." (Rec. Doc. 52-1 at 12). Chevron claims that it signed a Master Contractor Services Contract with Dynamic, whereby Dynamic would provide constructions and fabrication services to Chevron at various offshore locations and would provide these services as an independent contractor. Chevron also claims that it entered into a similar contract with Audubon, which stated that Audubon would perform various offshore construction and maintenance services as an independent contractor. (Rec. Doc. 52-1 at 3). According to Chevron, Dynamic dispatched Bittel to Chevron's Petronius platform to perform construction jobs, which included the removal of the A-3 flow line. (Rec. Doc. 52-1 at 3). Chevron claims that Dynamic was in charge of determining the methods and details of the work and supervising its employees. According to Chevron, its role was limited to

identifying the maintenance and construction work needed to be performed. (Rec. Doc. 52-1 at 4).

According to Chevron, a premises owner may owe a duty of care to employees of an independent contractor if the premises owner retains or reserves the right to control the performance of the work or if the work is inherently or intrinsically dangerous. Chevron argues that neither of these two exceptions applies in the present case. Chevron claims that if the proper clamp had been selected (the 3-ton clamp rather than the 1-ton clamp) the accident would not have occurred. Further, Chevron claims that no Chevron personnel were involved in any stage of the flow-line removal project. Chevron also argues that it retained no control over Audubon's work relating to the flow-line lift and that it, therefore, cannot be held liable for any negligence attributable to Audubon.

**B. Plaintiff Bittel's Opposition**

In opposition, Bittel claims that Chevron's motion should be denied because Chevron directly participated in the operations through its "company man" and caused the incident in question. (Rec. Doc. 55 at 1). Bittel claims that Danny Gauthreaux, an employee of Audubon, was assigned to be Chevron's representative on the platform and oversaw the pipe moving operations. Bittel claims that Gauthreaux was acting as Chevron's borrowed servant when he instructed Bittel to enter a barricaded area and to guide the pipe while it was being lifted. Bittel claims that this direct order resulted in him being placed in the "cone of danger." Bittel claims that recent discovery has revealed that Gauthreaux actually had an employment relationship with Chevron. Bittel points out that Gauthreaux used a Chevron laptop and Chevron e-mail address to relay progress reports and communications directly to Chevron. (Rec. Doc. 55 at 3). According to Bittel, the substantive role and function of Gauthreaux was the same as that of a permanent

Chevron employee. (Rec. Doc. 55 at 4). Bittel claims that Chevron is trying to shield itself from liability by creating an "independent contractor" agreement with Audubon while still retaining direct oversight and control over the operations on the platform through Gauthreaux. Bittel urges this Court to look at the "'reality of the worksite and the parties' actions in carrying out the contract" rather than at the express contract provision. (Rec. Doc. 55 at 11).

## III. LAW & ANALYSIS

### A. Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). When considering a motion for summary judgment, the district court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986). The court must find "[a] factual dispute [to be] 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party [and a] fact [to be] 'material' if it might affect the outcome of the suit under the governing substantive law." *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

**B. Independent Contractor and Borrowed Servant Doctrine**

For the purposes of this motion, Bittel concedes that Alabama law applies. Bittel was an employee of Dynamic. Bittel claims that Gauthreaux, an employee of Audubon, was responsible for his injury and that at the time of the incident, Gauthreaux was a borrowed servant of Chevron. The Court, therefore, must examine the relationships that existed between Chevron and the two companies that were hired to perform work on the platform – Dynamic and Audubon.

The distinction between an employee and an independent contractor is a very significant one with important implications in tort law. This is because, "[o]rdinarily, a principal is not liable for the incidental physical acts of negligence in the performance of duties committed by an agent who is not an employee, but an employer is held liable to third parties for an employee's negligence under the doctrine of *respondeat superior*." *Langfitt v. Federal Marine Terminals, Inc.*, 647 F.3d 1116, 1121 (11th Cir. 2011). Consistent with this idea, "[u]nder Alabama law, a premises owner is not liable for the torts committed by an independent contractor." *See Thompson v. City of Bayou La Batre*, 399 So. 2d 292, 294 (Ala. 1981). However, when the premises owner reserves the "right to control" the independent contractor, the relationship changes from premises owner and independent contractor to that of master and servant, and the premises owner can be held liable for the latter's negligence acts. *Ramirez v. Alabama Power Co.*, 898 F. Supp. 1537, 1542 (M.D. Ala. 1995) (quoting *Weeks v. Alabama Elec. Co-Op., Inc.*, 419 So. 2d 1381 (Ala. 1982)). In order to determine if a premises owner has retained the right to control the work performed by an independent contractor, Alabama courts examine two areas of evidence: "the terms of the contract between the parties and the conduct of the premises owner."

*Ramirez*, 898 F.Supp. at 1542.

In the present case, the terms of the contract between Chevron and Audubon indicate that Audubon was to provide services to Chevron as an independent contractor. On November 1, 2009, Chevron and Audubon entered into a Master Professional Services Contract. (Rec. Doc. 52-6 at 1). This contract provided that "[t]he Services are provided by Contractor as an independent contractor, and Contractor and the members of Contractor Group are not employees, agents or representatives of Company or Company Group." (Rec. Doc. 52-6 at 27). The contract further provided that "[a]s an independent contractor, Contractor has complete control, supervision and direction over its equipment and personnel and over the manner and method of the performance of the Services." (Rec. Doc. 52-6 at 27). Interestingly, the contract between Chevron and Dynamic contained an identical provision. (Rec. Doc. 52-5 at 40-41). Despite the similarity between the two contracts, the record shows that the relationship between Chevron and Audubon and Chevron and Dynamic was very different. Dynamic had been contracted by Chevron to perform construction work on the platform. Dynamic provided a crew on the platform to perform this work. This crew included a field superintendent who would supervise the crew's work. On the other hand, Chevron contracted with Audubon to fill a supervisory role on the platform. The record indicates that the Audubon-supplied individual, Gauthreaux, would act as a liaison between the Chevron engineers and the independent contractors who were hired to do the work, like Dynamic. His role was to provide oversight of the construction and maintenance activities that were occurring on the platform. *See* (Rec. Doc. 55-4 at 9).

The relationship between Chevron and Audubon raises questions regarding which entity should be considered the actual employer of Gauthreaux. Bittel argues that Gauthreaux was a

borrowed servant of Chevron at the time of the accident and, therefore, Chevron can be held liable for his negligent conduct. The borrowed-servant doctrine was created because "Courts recognized that '[i]t sometimes happens that one wishes a certain work to be done for his benefit, and neither has persons in his employ who can do it nor is willing to take such persons into his general services. He may . . . enter into an agreement with another [to] furnish [] him with men to do the work." *Langfitt*, 647 F.3d at 1122 (quoting *Standard Oil Co. v. Anderson*, 212 U.S. 215, 221 (1909)). In such a situation, the borrowed-servant doctrine is used to determine which principal should be held vicariously liable for the worker's negligent actions. *Id.* The Eleventh Circuit has explained that "the same considerations relevant in determining whether a person was an employee, as opposed to an independent contractor, guide the borrowed-servant inquiry." *Langfitt*, 647 F.3d at 1122. The analysis differs slightly in that the focus is on the relationship between the two principals rather than between the principal and the agent. *Id.* The ultimate test in determining whether an employee has become a loaned servant is "[w]hose work was the employee doing and under whose control was he doing it." *Coleman v. Steel City Crane Rentals, Inc.*, 475 So.2d 498, 500 (Ala. 1985).

The Alabama courts have emphasized that "[i]t is not the actual exercise of control which is determinative but rather the reserved right to control the employee." *Id.* "If reasonable persons can reach different conclusions on the question of whether a servant of one employee has temporarily become the servant of another, it is a question of fact for the jury." *Id.* at 501 (citing *United States Steel Corp. v. Mathews*, 261 Ala. 120, 123 (Ala. 1954)); *see also Ware v. Timmons*, 954 So.2d 545, 553 (Ala. 2006) ("Vicarious liability stemming from a master-servant relationship—respondeat superior liability—is usually a question of fact for the jury").

In *Coleman v. Steel City Crane Rentals, Inc.*, the Supreme Court of Alabama held that there was sufficient evidence in the record to support the jury's verdict that the borrowed-servant doctrine applied and that the Illinois Central Gulf Railroad Company (ICG) became the borrowing employer of the Steel City crane crew. The court recounted the evidence that was in the record. The court explained:

> The crane crew was employed and paid by Steel City, which in turn billed ICG for the services. Steel City decided which of its employees to send to any particular assignment. If ICG was dissatisfied in the work, it could dismiss the entire crew, but only Steel City could fire one of its employees. The employees testified that they were working for Steel City and assisting the railroad in clearing the tracks. There was evidence that positioning of the crane and the movement of the boom were decisions left entirely to the crane crew without direction from the railroad supervisors. However, there was also evidence that the ICG employees specified the way in which the line was to be clear, the location where the crane crew should begin working, the order of the cars to be put back on the tracks, and the time when the crane crew could leave the site. Railroad employees hooked the crane and the cars and signaled when the crane should lift the car.

475 So.2d at 500. The court also emphasized that one of Steel City's crew members testified that the ICG officials would tell them what to do. *Id.* at 501. The court stated that "[a]lthough the question is a close one, there is sufficient evidence from which the jury could have concluded that ICG employees went beyond suggestions for a cooperative effort and exercised supervisory control over the actions of the Steel City crane crew." *Id.*

In *Theriot v. Dawson Production Services, Inc.*, this Court dealt with a similar arrangement as the one involved in the present case. No. CIV. A. 97-1900; 1998 WL 637384 (E.D. La. Sept. 16, 1998). In that case, Defendant Parker & Parsley, Inc. ("Parker") contracted with Britt, Pharr & Associates, Inc. ("Britt, Pharr") to provide an individual to monitor the work performed at a

well site. *Id.* at *2. This individual, Sonny Leger, essentially worked as a "company man" for Parker. The contract between Parker and Britt, Pharr referred to Britt, Pharr as an "independent contractor." *Id.* at *4. The Court, however, looked beyond the contract in order to understand the "reality at the worksite," for the purposes of performing the borrowed-servant analysis. The Court emphasized that Leger reported to a Parker manager, did 90% of his work for Parker, and could be fired by Parker. *Id.* at *4. The Court concluded that he "was clearly taking instruction from and acting on behalf of Parker in performing his duties, and the agreement between the parties does not trump the overwhelming evidence that Leger was, for all practical purposes, an employee of Parker." *Id.* at *4.

In the present case there are facts in dispute that preclude Chevron's summary judgment motion at this time. At the time of the accident, Gauthreaux was serving as a facility representative on the platform. Gauthreaux testified that he considered himself a "[f]acilities representative, company man." (Rec. Doc. 55-3 at 26). Chevron's corporate representative testified that his job was "to provide broader oversight of construction and maintenance activities that were occurring at that time on the platform. . . . [H]is job is insuring overall performance schedule, cost management, logistics arrangement . . ." (Rec. Doc. 55-4 at 9). Gauthreaux testified that his position required him to talk directly to Chevron engineers and acts as a "liaison" between Chevron and the third-party contractor. (Rec. Doc. 55-3 at 30). Gauthreaux testified that he ultimately reported to the Chevron engineers. (Rec. Doc. 55-3 at 29). He would receive a "punch list" from the Chevron engineers that listed the tasks that needed to be completed. Chevron's corporate representative testified that Gauthreaux had very similar duties and responsibilities as he would have had if he had been employed by Chevron to do that same

job. (Rec. Doc. 55-4 at 22). Gauthreaux had a Chevron supplied laptop and Chevron e-mail address. Gauthreaux used the laptop to run reports regarding time, material and costs involved in a job. (Rec. Doc. 55-3 at 23). Gauthreaux also played a role in safety meetings. (Rec. Doc. 55-2 at 83-84). Chevron's primary reason for going through Audubon instead of hiring its own employee to do this job was that terminating the relationship was much easier when the worker was supplied by a company like Audubon. (Rec. Doc. 55-4 at 19) ("That's a primary reason. We can just—we can just separate, and typically we say, sir, thank you. Services are no longer required.").

Chevron's corporate representative testified that the relationship with Audubon required Audubon to supply facility representatives to Chevron. Audubon would offer someone for the position, but Chevron would have the ability to approve or reject the offered individual. (Rec. Doc. 55-4 at 18). If, for instance, Chevron did not know the person or had not worked with the person before, Chevron could reject Audubon's selection. (Rec. Doc. 55-4 at 18). Chevron's corporate representative further testified that facility engineers would form relationships with certain individuals and would try to select those individuals because those individuals know "how Chevron likes work conducted on our behalf." (Rec. Doc. 55-4 at 18). Gauthreaux had been doing work for Chevron for many years before the accident.

While Chevron did not directly compensate Gauthreaux for his work, Audubon would bill Chevron a specific rate for Gauthreaux's work. This rate would depend on the experience of the individual, including how much time that individual had spent with Chevron. (Rec. Doc. 55-4 at 28). Gauthreaux would receive a portion of that billed rate. (Rec. Doc. 55-4 at 28, 30).

The evidence indicates that Chevron did not have the ability to fire Gauthreaux.

However, Chevron could dismiss him from the particular job. In fact, after the accident involving Bittel, Chevron put Gauthreaux on leave. (Rec. Doc. 55-6 at 1) ("Management wants us to put Danny on an extended leave from Chevron. Please start coordinating with the new Rep."). It is also worth noting that at the time of the accident, Chevron was reviewing Gauthreaux for a permanent position with Chevron and had recently decided to hire him although Chevron ultimately changed its mind and did not offer him the position. (Rec. Doc. 55-4 at 58, 60).

The facts in this case are similar to the facts in *Coleman* and *Theriot*. Accordingly, the Court finds that there are material facts in dispute regarding whether Chevron retained the right to exercise control over Gauthreaux's work. Furthermore, if Gauthreaux was a borrowed servant of Chevron, there remain facts in dispute regarding whether he was acting within the scope of his employment if/when he directed Bittel to get inside the barricade. Therefore, summary judgment is inappropriate on the issue of *respondeat superior*.

## II. CONCLUSION

For the foregoing reasons,

**IT IS ORDERED** that Chevron's Motion for Summary Judgment (Rec. Doc. 52) is hereby **DENIED.**

New Orleans, Louisiana, this 12th day of August, 2014.

UNITED STATES DISTRICT JUDGE